**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER M. BLACK,** | ) | |
| No. 00260259, | ) | |
| | ) | |
| Petitioner, | ) | **No. 3:16-cv-00704** |
| | ) | **Judge Trauger** |
| v. | ) | |
| | ) | |
| **TODD THOMAS, Warden,** | ) | |
| | ) | |
| Respondent. | ) | |

<u>**M E M O R A N D U M**</u>

**I.    Introduction**

Petitioner Christopher M. Black, an inmate of the Trousdale Turner Correctional Facility in Hartsville, Tennessee, has filed a *pro se* petition for a writ of *habeas corpus* brought pursuant to 28 U.S.C. § 2254 challenging his 2006 conviction and sentence for two counts of aggravated rape and two counts of aggravated robbery for which he currently is serving a term of imprisonment of fifty years in the Tennessee Department of Correction.

Presently pending before the court is the Warden's response to the *habeas* petition in which he asks the court to dismiss the petition. (Docket No. 15). The petitioner has not replied to the response.

The petition is ripe for review, and this court has jurisdiction. 28 U.S.C. § 2241(d). Having fully considered the record, the court finds that an evidentiary hearing is not needed, and that the petitioner is not entitled to relief. The petition therefore will be denied and this action dismissed.

**II.    Procedural History**

In 2010, a Davidson County Criminal Court jury convicted Christopher Black of two counts

of aggravated rape and two counts of aggravated robbery. *State of Tennessee v. Christopher Black*, No. M2007-00970-CCA-R3-CD, 2010 WL 8500217 (Tenn. Crim. App. Feb. 26, 2010), *perm. app. denied* (Tenn. Aug. 26, 2010). The petitioner was sentenced to consecutive twenty-year sentences for the aggravated rape convictions and concurrent ten-year sentences for the aggravated robbery sentences. *Id*.

On direct appeal, the Tennessee Court of Criminal Appeals affirmed the petitioner's convictions but remanded for a resentencing hearing "with respect [to] the 2005 sentencing act and regarding the issue of consecutive sentencing." *Id*. Following a hearing on remand, the trial court sentenced the petitioner to twenty-five years for each count of aggravated rape and to ten years for each count of aggravated robbery. The court further found the petitioner to be a dangerous offender and ordered that the two aggravated rapes be served consecutively, but concurrently to the sentences for robbery, again resulting in an effective sentence of fifty years.

On appeal after the resentencing, the Tennessee Court of Criminal Appeals affirmed the petitioner's sentences. *State of Tennessee v. Christopher Black*, No. M2010-02176-CCA-R3-CD, 2011 WL 7562957 (Tenn. Crim. App. Dec. 13, 2011), *perm. app. denied* (Tenn. May 16, 2012). The Tennessee Supreme Court denied the petitioner's application for discretionary review. *Id*. at *1.

Black filed a timely *pro se* petition for state post-conviction relief on October 18, 2012. *Christopher M. Black v. State of Tenn.*, No. M2014-01607-CCA-R3-PC, 2015 WL 1285713, at *8 (Tenn. Crim. App. Mar. 19, 2015), *perm. app. granted* (Tenn. Aug. 21, 2015). Counsel was appointed, and a new petition for post-conviction relief was filed on September 4, 2013. *Id*. Following an evidentiary hearing, the post-conviction court denied the petition, and the petitioner filed a timely notice of appeal. The Tennessee Court of Criminal Appeals affirmed on March 19,

2015. *Id.*

The Tennessee Supreme Court granted the petitioner's application for permission to appeal and remanded the matter to the post-conviction court for the entry of a supplemental order denying the petition. *Christopher M. Black v. State of Tenn.,* No. M2014-01607-CCA-R3-PC, 2015 WL 9487735, at *5 (Tenn. Crim. App. Dec. 29, 2015). The court explained that the original order entered by the post-conviction court did not accurately reflect what occurred at the hearing on the petition. *Id.*

The post-conviction court filed a supplemental order denying post-conviction relief on September 16, 2015. *Id.* In the supplemental order, the post-conviction court outlined the facts presented at the post-conviction hearing and concluded that the petitioner had failed to establish that trial counsel was ineffective. *Id.* On discretionary review, the Tennessee Supreme Court affirmed the post-conviction court's denial of relief. *Id.* at *6.

On April 4, 2016, the petitioner filed the instant timely petition for writ of *habeas corpus*. (Docket No. 1). The respondent filed a response on June 15, 2016, urging the court to dismiss the petition. (Docket No. 15).

In his petition, the petitioner asserts a single claim for relief: that he received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution. (Docket No. 1 at 3).

## III.   Summary of the Evidence

### A.   Facts of the Offense

In its direct-appeal opinion affirming the trial court's judgment, the Tennessee Court of Criminal Appeals summarized the pertinent facts of the offense, conviction, and sentence as

follows:[1]

This case stems from a brutal attack upon a female victim, L.P., and a male victim, D.B., beginning in the late hours of February 12, 1999, and ending in the early morning hours of February 13, 1999. The victims had been friends for several years. Around 11:30 p.m. on the night of the offense, the female victim drove to the male victim's parent's home where the male victim lived to borrow a movie. She pulled her vehicle in front of his home and paged him to come outside. The male victim came outside, gave her the movie, and sat inside her vehicle to talk. About fifteen minutes later, the male victim was getting out of the vehicle when he and the victim saw two men with hoods coming through his yard.

The female victim stated that the two men came around from behind her vehicle, over to the driver's side, and knocked on the window. Neither victim knew the two men. The female victim cracked the window, and a revolver was stuck in the window to her temple. The men screamed at the female victim, "Get out of the car, bitch. Get out of the car bitch." The vehicle was still running, and she unlocked the door and opened it. The female victim said that a chrome revolver was put to her head. She stated, "[I]t looked like it had a pearl, or like, an engraved handle. Looked more like a collector's gun."

When the female victim began to get out of the vehicle, the men pushed her back inside. At this point, she stated that she was in the front seat of her vehicle. The male victim had gotten out of the vehicle and was on the ground. The men went through the vehicle and told the victim they wanted her wallet and money. She told them that she only had ten dollars, and they yelled at her for not having more money. The men looked through the trunk twice and took the female victim's credit cards.

The female victim differentiated between the two men by their skin tone. After the men asked for the female victim's money, the female victim stated that the man with the dark complexion demanded that she perform oral sex on him. She testified that he said, " '[Y]ou're going to suck my d* * *.' " She said that she complied because she

[1]The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1).("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). The petitioner here does not contest the appellate court's statement of facts.

had a gun to her head and was terrified. She stated, "It started in the street. He made me get on my knees in the street and perform oral sex. And they both switched back and forth between four to six times." Both men forced her to perform oral sex against her will and consent by threatening her with a weapon.

The female victim testified that after the men forced her to perform fellatio on them, the man with the lighter complexion said, " 'I want to f* * * this b* * * *.' And they made [her] pull down [her] pants and bend over in the street. And they took turns raping [her] from behind." When one man was raping her, the other was watching for oncoming cars. After being vaginally raped, the female victim was forced back inside the car to perform oral sex. Initially, the female victim could not recall if either man ejaculated. However, she later stated that, at some point, one of the men ejaculated in her mouth. She could not recall where she was physically positioned but she gagged, and spit the ejaculate outside the vehicle on the pavement of the street.

The female victim recalled that the male victim begged the men to stop. The men began to leave, but came back. They ordered the male victim to run down the street while they held the female victim by her hair at gunpoint. The men then pushed the female victim, and told her to run and not to look back. The female victim found the male victim, and they ran down the street knocking on doors until someone gave them a phone to call 911. The male victim's father came to pick them up and later took them to the crime scene to wait on the police. When the female victim returned to the scene, her vehicle was still there with the four doors open.

At trial, the female victim identified photographs from the crime scene. She specifically identified a photograph of the ejaculate that she spit out onto the pavement. It was admitted into evidence as collective exhibit 1G. She recalled that the police officers marked exhibit 1G as significant. She described both men as in their early twenties. She also estimated that the attack lasted around thirty to forty-five minutes. She stated that the men were dressed alike. They wore masks, black jeans and sweatshirts, but one man had on a red shirt and the other a blue shirt. The man with the blue shirt had a dark complexion and the man with the red shirt had a light complexion.

The female victim was not missing any of her credit cards, but the men took her ten dollars. She told the police what happened and was given a gynecological examination that night. The police obtained

internal vaginal swabs and swabs of her mouth. A black light was placed over her naked body to determine the existence of any pubic hairs or semen. The police also took the female victim's clothes. The female victim stated that she did not discuss what she was going to tell the police with the male victim.

The female victim recalled that, at some point, the two men took their masks off. However, she could only remember seeing the lighter complected man's face. She and the male victim provided the police with a sketch; however, she had no input in the sketch developed by male victim. She stated that she did not remember anything about the man with the dark complexion.

On cross-examination, the female victim acknowledged that she had trouble remembering the sequence of events; specifically, whether she was forced to perform oral sex or was vaginally raped first. In regard to the events leading up to the man's ejaculating in her mouth, she said she could not remember whether both men or only one man forced her to perform oral sex. She further conceded that she was unsure if the man with the lighter complexion ejaculated in her mouth. She also admitted that she had previously misidentified a busboy that she saw at a restaurant from a photographic lineup as the man with the lighter complexion. This photographic lineup was admitted into evidence as exhibit 8.

The female victim explained that the attack occurred in a residential neighborhood and that the area was illuminated by the headlights on her vehicle and by various streetlights. She recalled that the inside of the vehicle was illuminated from the dash board. She explained that the men wore masks when they pistol-whipped Brewer but took them off during the rape. She had no memory of either man wearing gloves but stated that both men held her credit cards in their hands.

The male victim testified and corroborated the female victim's testimony. He explained that when he went outside to meet her that night, everyone else inside his house was asleep. He stated that the men took his coat, which contained his wallet and $350. He also had a "stereo face" inside his coat pocket. The two men also took his earrings, skull cap, and tennis shoes. He noticed that the men had a silver weapon, and he saw one of the men forcing the victim to perform oral sex on him.

The male victim also distinguished the men by skin tone and said that the man with the dark complexion had the gun. He saw the darker

complected man, whom he later identified as Black, forcing the victim to perform oral sex on him. The male victim confirmed that the man with the dark complexion also hit him in the back of the head with the gun. He went to the hospital and received nine stitches to the head and had a scar as a result. He provided a statement to the police and worked on a sketch that same day. The male victim said that he worked on the sketch which was admitted into evidence as exhibit 2.A. When the sketches in this case were developed, the male victim and the female victim were not in the same room.

The male victim identified Black as the person he saw forcing the female victim to perform oral sex on him from a photographic lineup, which was admitted into evidence as exhibit 4. The male victim testified that it was "the eyes" that stood out to him. He said that the man was younger than he, 5'10" tall and 130 pounds. He admitted that he had previously been confused about whether Black wore a red shirt or a blue shirt but said he was certain of his identification.

On cross-examination, the male victim stated that his credit card was used at a gas station and two other stores within thirty minutes of the offense. He conceded that in two prior photographic lineups, he identified another individual as someone who "looked like" the dark complected man. He clarified that in each of those lineups, he told Detective Sutherland that he "wasn't one hundred percent sure" or was "not positive" of the identification. Four years after the initial photographic lineups, the male victim was brought in to view another photographic lineup. Detective Sutherland told him he had a possible suspect and that there was a DNA match. The male victim testified that when he identified Black from the photographic lineup, Detective Sutherland told him that he had chosen the person confirmed by DNA analysis.

The male victim's sister testified that she was at home on the night of the offense. She heard noises outside and heard someone say "Make those 'hos run." She woke her father, went outside, and noticed the female victim's vehicle in front with the doors open and things on top of the roof. There was no one around at the time. She called the non-emergency number, and she and her father closed the doors to the vehicle. She later received a call from a neighbor indicating the female victim and her brother were there and had been hurt. She went inside to upgrade her previous non-emergency call to a 911 call.

Michael Evans, a ten-year veteran with the Metro-Nashville Police Department, was one of the first officers to respond to the scene on

the night of the offense. He secured the crime scene, blocked one of the side roads, and called the "ID division" because it was a major crime. He received a description of the suspects from the male victim and put out a "BOLO" or "be on the look-out" announcement containing the male victim's description of the two men involved in the offense. He was told that one of the men had on blue jeans, not black jeans. He was also told that one of the men had on a red pullover sweater, not a red t-shirt and a black pullover sweater. He was further told that the other man wore a blue pullover sweater and blue jeans.

Johnny Lawrence, an officer with the Technical Investigation Division (TID) of the Metro-Nashville Police Department, testified that he responded to the crime scene on the night of the offense. He did not completely examine the vehicle at the scene that night. However, he took the vehicle to another location to be processed. All of the items at the scene were collected by Officer Lawrence. He stated that he collected evidence of bodily fluid off the roadway, which was located near the center of the street on the driver's side of the vehicle, and was visible to the naked eye. Officer Lawrence photographed the substance and obtained samples of the evidence. At trial, he explained his efforts to collect this evidence:

> I attempted to pick some of it up with what we call a filter paper. We use that to do rugs with, mainly with blood. I also use them to collect hair samples and items. But I tried to rub the stain to try to pick it up, because it was such a broad area, but I tore the paper doing that. So, then, I used cotton swabs with distilled water, so I could pick it up and get a better collection of it.

Officer Lawrence identified an evidence bag with the number 9972874 as the original bag in which he placed the evidence swabs collected from the crime scene. He stated that the bag also contained filter paper and swabs. He observed that other people had placed their initials on the bag, which indicated that the contents had been processed or examined. He turned the evidence bag over to the "refrigeration" unit, specifically Brad Johns, a detective in the homicide unit. He had no further contact with the evidence. The bag was admitted into evidence as part of collective exhibit 11.

Officer Lawrence acknowledged on cross-examination that although he normally puts his initials on evidence bags, this bag did not

contain his initials. He confirmed that the handwriting on the bag was his. He further stated that he wrote the complaint number, date, time, location, and a description of the evidence swabs on the evidence bag. On re-cross examination, he stated he may have forgotten to put his initials on the bag but affirmed that he turned the evidence over to Detective Johns. The state admitted exhibit 15, entitled "Supplemental Report," in support of Officer Lawrence's testimony. Exhibit 15 was a typed report containing the victim's name, the date of the instant offense, and complaint number 9972874. Exhibit 15, which was signed by Detective Brad Johns, stated the following:

> At approximately 0220hrs on February 13, 1999, ID Officer Lawrence gave me a bag containing swabs that he took from the street near [the offense location]. These swabs were put in the drying box by myself, and an evidence tracking form was started on these items.

At the time of the offense, Detective Brad Johns was assigned to the homicide unit. He testified and confirmed that he obtained the bag of evidence from Officer Lawrence from the crime scene in the instant case. He said that he stood in front of Officer Lawrence and watched him fill out the time the evidence was collected, the contents of the bag, and the complaint number. Detective Johns opened the evidence bag and saw that it contained three swabs and one cloth. He carried that  bag of evidence to the property room and placed it in the drying cabinet for storage. He filled out exhibit 14, an evidence tracking form which showed the chain of custody, and exhibit 15, the supplemental report of the evidence. He verified that he locked the storage cabinet and gave the key to Detective Steve Cleek that morning.

Steve Cleek was a detective in the homicide unit at the time of the offense. He did not go to the crime scene but became involved in the chain of custody. Detective Cleek said that Detective Brad Johns had a rape kit, put it in an air-drying box, and gave him the key to the box because Detective Johns was not working the next two days. Detective Johns gave Detective Cleek the key to the box to give to the detectives in the sex crimes unit. Detective Cleek testified that he gave the key to Detective Sutherland. Exhibits 20A and 20B, reports by Detective Cleek, were admitted into evidence in support of his testimony.

Phillip Sage, a sergeant with the Metro–Nashville Police Department property room, testified that only police officers and employees have access to evidence kept in the property room warehouse. He described a sheet of paper which documented the police department custody of the

evidence in this case. The sheet was admitted into evidence as exhibit 19. Exhibit 19 showed that on April 15, 1999, Mary Wilhoite and Mike Nichols took the rape kit from the property room to the Tennessee Bureau of Investigation (TBI) crime lab. On August 17, 1999, Detective Sutherland returned the evidence to the property room from the crime lab.

Sandy Myers, a nurse practitioner at the Nashville General Hospital, testified regarding the medical legal exam (MLE) performed on the female victim. Myers stated that she had previously conducted over 500 MLE's and was tendered as an expert in the field of medical legal examination. Myers also testified as the records custodian for the hospital and explained the female victim's rape report. The report showed the areas of contact as the mouth, the vulva, and the vaginal area. It corroborated that the perpetrator ejaculated on the street and was consistent with the female victim's being sexually penetrated. The report further indicated that the perpetrator did not wear a condom, and swabs from the rape kit tested negative for sperm. The report was admitted into evidence as exhibit 16, and the rape kit was admitted into evidence as exhibit 17.

Myers stated that the kit was not retrieved by the police that night. She explained that in such cases, the kit is locked in a cabinet specified for MLE's. She then verified that exhibit 16 showed that the kit was locked in the cabinet at 4:01 a.m. on the night of offense and released at 8:00 p.m. the same day to Detective Sutherland. Based on exhibit 18, another hospital report, Myers stated that Black was brought to the hospital on September 22, 2003, to have his blood drawn. Exhibit 18 showed all of Black's identifying information including his name, date of birth, and social security number.

Detective Keith Sutherland was assigned to this investigation; however, he did not go to the crime scene or collect any evidence. He relayed the BOLO's, took written statements from the victims, scheduled the sketch with the victims, and arranged for a time for the victims to review composites. Detective Sutherland testified that Officer Lawrence had collected certain evidence which was secured in a drying box in the property room. Detective Cleek gave him the key which contained the swabs that were taken from the crime scene. He stated that he went to the hospital to retrieve the rape kit on February 15, 1999. The kit was sealed, and Detective Sutherland did not observe anything unusual about it. Detective Sutherland confirmed that it was his signature on exhibit 16, the hospital report, showing that he obtained the rape kit. On February 18, 1999, Detective Sutherland took the rape kit and placed it in the property room inside the drying cabinet, with the exception of the blood sample which he placed in the refrigerator. Detective Sutherland stated

that he did not add anything to the rape kit or the bags containing the swabs recovered from the scene. He later took the evidence from the property room to the crime lab. Detective Sutherland conceded that he mistakenly wrote victim/MLE instead of subject/MLE on the TBI request to examine blood from another suspect. He also explained the fingerprint analysis did not result in a match with Black.

Detective Sutherland stated that he entered the female victims' description of the perpetrators in the computer in order to develop the photographic lineup. As a result, the computer generated a pool of people. Detective Sutherland additionally explained that unlike the computer generated photographs, he had to get a photograph of the busboy that the female victim initially believed was involved in the offense from the Department of Transportation. He confirmed that the female victim initially identified the busboy as the perpetrator. Other than a telephonic interview wherein the busboy denied involvement in the offense, Detective Sutherland did not do any further investigation regarding the busboy. Detective Sutherland also stated that he did not investigate the charges on the male victim's credit card because he believed that any surveillance tapes that existed at the time of the offense had already been taped over due to the passage of time.

Detective Sutherland received exhibit 22, a serology report dated July 19, 1999, from Agent Minor stating that sperm and semen were present on the evidence swabs taken from the crime scene. Exhibit 22 provided that DNA analysis could be performed upon receipt of a subject blood standard and a request from the district attorney general. On December 27, 2002, Detective Sutherland filled out a re-submittal form requesting Agent Minor to compare another suspect's DNA with the DNA located at the crime scene and to enter the results into the Combined DNA Index System ("CODIS").2 Detective Sutherland said that he physically checked exhibit 11 out of the property room and took it to the TBI crime lab. He stated that he did not manipulate the evidence in any way.

Exhibit 36, another serology report, was dated August 20, 2003. Based on exhibit 36, the suspect's blood that Detective Sutherland sent for analysis did not match the DNA recovered from the crime scene. However, Detective Sutherland received Black's name from Agent Minor as a potential match from the CODIS database. Detective Sutherland subsequently obtained a search warrant for a sample of Black's blood. He also observed the blood sample being drawn from Black and physically took the blood sample to the TBI. Exhibit 29 was admitted into evidence and was described as a box containing vials of Black's blood. After receiving confirmation that Black's blood sample matched the DNA from the semen located at the crime scene, Detective Sutherland obtained a warrant for Black's arrest.

Following the DNA confirmation, Detective Sutherland set up a photographic lineup with the male victim. He did not tell the male victim anything prior to the viewing. Specifically, Detective Sutherland informed the male victim that he wanted to set up another photographic lineup "due to a CODIS hit—I don't know that I went in to detail." Detective Sutherland said that the male victim picked Black "almost immediately" from the photographic lineup.

Detective Sutherland acknowledged that a second vehicle in Brewer's driveway had been touched by the perpetrator, but no fingerprint analysis had been performed. He also confirmed that none of the fingerprints lifted from the scene belonged to Black. Detective Sutherland further conceded that in the photographic lineup containing Black, the background of Black's photograph was blue while the background of the other photographs was brown. He also admitted that there was no documentation of the location of the rape kit between February 18 and February 23. He stated that "[t]he custody of this would have been, either, one, locked in my office; or, two, locked in ... the drying box, along with the large bag of clothing we just discussed." Detective Sutherland said that he did not break the rape kit down, but he did take the blood sample out and place it in the refrigerated cabinet. He conceded that this action was not documented.

Joe Minor, a forensic scientist for twenty-three years and a special agent with the TBI crime laboratory, testified that he was the Nashville DNA supervisor. He was originally provided with evidence from the crime scene in the instant case in April 1999. The items submitted to the crime lab included a vial of the female victim's blood, saliva and vaginal swabs, and a brown bag containing three evidence swabs. All of the items were brought into the lab on April 15, 1999, by Mary Wilhoite. He also received the evidence from the MLE on the victim. He examined (1) the vaginal swabs, (2) the oral swabs, (3) the evidence swabs, and (4) the TBI bloodstain card containing the victim's blood sample. He retrieved the MLE kit from the evidence vault, recorded the time, and took it back to his work area. He then broke the seal from the Metro Police Department to perform his examination. His file noted that he received the kit "sealed with blue evidence tape."

In Agent Minor's first report, there was no exam performed on the female victim's DNA. He explained that TBI's policy at that time was not to perform an exam when there was no suspect blood standard unless there was a request from the district attorney. Regarding the vaginal swabs, Agent Minor observed the presence of both sperm and semen. No sperm was present on the oral swabs. However, the swabs containing the bodily fluid collected from the street tested positive for sperm, and

Agent Minor took additional cuttings for later DNA comparison and testing. Agent Minor placed the evidence back in the box, and sealed it with tamper proof tape.

When he received the re-submittal form, Agent Minor performed DNA analysis from the semen on the evidence swab against the requested suspect. The comparison was not consistent with the DNA from the semen recovered from the crime scene; however, it did show an unknown male profile which enabled Agent Minor to run that profile in the CODIS database. As a result of the unknown male profile, Agent Minor received a "CODIS hit" on the defendant, Christopher Black. Agent Minor stated that when the box containing the rape kit was returned to him, it was sealed with his original TBI tape. Agent Minor broke the seal to get into the box, and took the evidence swabs out. He obtained a complete profile from the evidence swabs.

Agent Minor explained that exhibit 26 was the re-submittal form for the female victim's rape kit. The evidence from the kit that was tested in 1999 was re-submitted in 2002. He further stated that exhibit 35 was a copy of the report with his additions to it. Agent Minor stated:

> So, the first time ... that I got [the rape kit] in 1999 it had been sealed. When I received it for DNA analysis I broke my own seals, took the evidence out, set it up for DNA analysis. And then at the conclusion resealed it with the evidence tape.... So, it was initially sealed. It came in sealed. I returned it sealed, and taped again.

Agent Minor then provided detailed testimony on his search of the DNA database called CODIS that contained DNA profiles.

Agent Minor stated that although he received a CODIS "hit" on Black, he needed an actual blood sample from Black to confirm the CODIS hit. He received a blood sample from Black on September 23, 2003. Agent Minor stated that he developed a profile based on Black's blood sample and that Black's profile "matched" the evidence swab collected from the rape kit containing the semen. Agent Minor testified that the word "match" meant that the numbers that are the actual allele types in the DNA profile. He explained that "for those thirteen locations, every one of those numbers are the same." He further stated that the probability that it was not a match in the Caucasian population is one in sextillion, and in the African American population it was one in thirty-nine sextillion. He testified that the probability that it could be someone other than Black exceeded the world's population by "at least a million times over [.]" In conclusion, Agent Minor opined that there was no one else on earth who would have the same profile.

On cross-examination, Agent Minor acknowledged a typographical error in the report as to the date the evidence was received.

*State of Tennessee v. Christopher M. Black,* No. M2007-00970-CCA-R3-CD, 2010 WL 8500217, at **1-9 (Tenn. Crim. App. Feb. 26, 2010).

### B. Evidence Presented at the Post-Conviction Evidentiary Hearing

In affirming the denial of post-conviction relief, the Tennessee Court of Criminal Appeals summarized the evidence presented at petitioner's post-conviction evidentiary hearing as follows:

> At a hearing conducted June 25, 2014, the Petitioner testified that he had three jury trials in his case: the first resulted in a mistrial, the second resulted in a hung jury, and the third resulted in his convictions for aggravated rape and aggravated robbery. Trial counsel represented the Petitioner in each of the trials and in his two appeals. The Petitioner testified that he believed trial counsel had been prepared for trial.
>
> Trial counsel talked to the Petitioner about the evidence against him and about the defense strategy. The Petitioner testified that the State's DNA evidence was a key part of the case against him but he was unsure of how trial counsel intended to defend against it. He explained, "I mean, I have no doubt they had DNA evidence against me, but I didn't know what the defense was going to be to defend against the DNA evidence." The Petitioner did not recall speaking to trial counsel about his response to the DNA evidence other than that trial counsel intended to cross-examine the State's DNA expert.
>
> The Petitioner testified that trial counsel did not discuss the possibility of hiring a DNA expert for the defense. Moreover, the Petitioner was unaware that trial counsel could request funds to hire such an expert. The Petitioner testified that, had he known funds were available, he would have insisted on a DNA expert of his own. The Petitioner acknowledged, however, that trial counsel attacked the DNA evidence during each of his trials by attacking the chain of evidence. Trial counsel also attacked the eyewitness testimony concerning the identification of the Petitioner and vigorously cross-examined the officers in charge of the investigation. He further acknowledged that several of the issues raised by trial counsel on

direct appeal related to the DNA evidence. The Petitioner did not call a DNA expert to testify on his behalf at the post-conviction hearing.

At the conclusion of the hearing, the post-conviction court entered a written order denying relief.

*Christopher M. Black v. State of Tenn.*, No. M2014-01607-CCA-R3-PC, 2015 WL 1285713, at *9

(Tenn. Crim. App. Mar. 19, 2015), *perm. app. granted* (Tenn. Aug. 21, 2015).

Applying *Strickland*, the court then found as follows:

> The Petitioner contends that he was denied the effective assistance of counsel based upon trial counsel's failure to seek indigent funds for a DNA expert for the defense and, as such, he is entitled to post-conviction relief. The State responds that the Petitioner did not present a DNA expert at the post-conviction hearing and that he, therefore, failed to demonstrate prejudice resulting from trial counsel's failure to obtain such a witness. We agree with the State's assessment. As we have repeatedly cautioned, a post-conviction petitioner cannot succeed on a claim that "counsel was deficient [for failing to call] a known witness" unless the petitioner "produce[s] a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." *Black v. State*, 794 S.W.2d 752, 757–58 (Tenn. Crim. App. 1990). " 'As a general rule, this is the only way the petitioner can establish that ... the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which enured to the prejudice of the petitioner.' " *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008) (quoting *Black*, 794 S.W.2d at 757). Neither the post-conviction court nor this Court "can speculate or guess on ... what a witness's testimony might have been if introduced." *Black*, 794 S.W.2d at 757. Based upon the Petitioner's failure to present a DNA expert at the hearing, we find that the Petitioner is not entitled to post-conviction relief.

*Id.* at *10.

## IV. General Standards Governing Review of § 2254 Petitions

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"). The AEDPA was enacted "to reduce delays in the execution of state and

federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003) (internal citations and quotation marks omitted). As the Supreme Court explained, the AEDPA "recognizes a foundational principle of our federal system: State courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. ——, 134 S. Ct. 10, 15, 187 L.Ed.2d 348 (2013). The AEDPA, therefore, "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Id.*

One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of *habeas corpus* is found in 28 U.S .C. § 2254(d). Under the AEDPA, the court may grant a writ of *habeas corpus* on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The state court's factual findings are presumed to be correct and they can be contravened only if the petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. 28 U.S.C. § 2254(e)(1). The petitioner is entitled to an evidentiary hearing if he alleges sufficient grounds for issuance of the writ, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing. *Sawyer v. Hofbauer*, 299 F.3d 605, 610 (6th Cir. 2002). As the Supreme Court has advised, "[t]he question under AEDPA is not whether a

federal court believes the state court's determination was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473, 127 S. Ct. 1933, 167 L.Ed.2d 836, (2007) (citing *Williams*, 529 U.S. at 410). The Supreme Court has held that review under § 2254(d) (1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 131 S. Ct. 1388, 1398, 179 L.Ed.2d 557 (2011).

Further, "[b]efore seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted). Claims which are not exhausted are procedurally defaulted and "ordinarily may not be considered by a federal court on habeas review." *Alley v. Bell*, 307 F.3d 380, 388 (6th Cir. 2002).

"In order to gain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate cause and prejudice for the failure, or that a miscarriage of justice will result from the lack of review." *Alley,* 307 F.3d at 386. A petitioner can establish cause in two ways. First, a petitioner may "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Objective impediments include an unavailable claim or interference by officials that made compliance impracticable. *Id.* Second, constitutionally ineffective assistance of trial or appellate counsel may

constitute cause. *Murray*, 477 U.S. at 488–89. Generally, however, if a petitioner asserts ineffective assistance of counsel as cause for a default, that ineffective-assistance claim must itself have been presented to the state courts as an independent claim before it may be used to establish cause. *Id.* If the ineffective-assistance claim is not presented to the state courts in the manner that state law requires, that claim is itself procedurally defaulted and can only be used as cause for the underlying defaulted claim if the petitioner demonstrates cause and prejudice with respect to the ineffective-assistance claim. *Edwards v. Carpenter*, 529 U.S. 446, 452–53, 120 S. Ct. 1587, 146 L.Ed.2d 518 (2000).

Until recently, a prisoner could not demonstrate cause for default by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See Coleman v. Thompson*, 501 U.S. 722, 752–53, 111 S. Ct. 2546, 115 L.Ed.2d 640 (1992) (holding that attorney error is not cause to excuse a default). The holding in *Coleman* was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, so the prisoner "must bear the risk of attorney error that results in a procedural default." *Id.* (internal quotations omitted).

Recent changes in the law, however, have enabled petitioners in Tennessee to establish "cause" to excuse the procedural default of a substantial claim of ineffective assistance by demonstrating the ineffective assistance of post-conviction counsel in failing to raise the claim in initial-review post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. ——, 132 S. Ct. 1309, 1315, 1320, 182 L.Ed.2d 272 (2012) (creating an exception to *Coleman* where state law prohibits ineffective-assistance claims on direct appeal); *Trevino v. Thaler*, 569 U.S. ——, 133 S.C t. 1911, 1921, 185 L.Ed.2d 1044 (2013) (extending *Martinez* to states with procedural frameworks that make

meaningful opportunity to raise ineffective-assistance claim on direct appeal unlikely); *Sutton v. Carpenter*, 745 F.3d 787, 792 (6th Cir. 2014) (holding that *Martinez* and *Trevino* apply in Tennessee).

The Supreme Court's creation in *Martinez* of a narrow exception to the procedural-default bar stemmed from its recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim." *Martinez*, 132 S. Ct. at 1318. In other words, *Martinez* requires that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," and that "the underlying ineffective-assistance-of-trial-counsel claim [be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *See id.* at 1318–19, 1320. Importantly, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*, 501 U.S. at 750.

To establish prejudice, a petitioner must demonstrate that the constitutional error "worked to his actual and substantial disadvantage." *Perkins v. LeCureux*, 58 F.3d 214, 219 (6th Cir. 1995) (quoting *United States v. Frady*, 456 U.S. 152, 170, 102 S. Ct. 1584, 71 L.Ed.2d 816 (1982) (emphasis in original)). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (citations omitted).

Because the cause-and-prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the Supreme Court has also recognized a narrow exception to the cause requirement where a constitutional violation has "probably resulted" in the conviction of one who

is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392, 124 S. Ct. 1847, 158 L.Ed.2d 659 (2004) (citing *Murray*, 477 U.S. at 496).

## V.    Analysis

With these principles in mind, the court will turn to the examination of the ineffective assistance of counsel claim raised in Black's petition for *habeas* relief.  The court's review of the record reveals that the petitioner raised his claim in the amended petition for post-conviction relief and also raised the claim in his post-conviction appeal.  The court therefore finds that the claim is exhausted and properly before the court.  Nevertheless, the respondent maintains that Black's claim should be dismissed.

The petitioner specifically contends that his trial counsel failed to seek indigent funds for a DNA expert on behalf of his defense.[2]  (Docket 1 at p. 24).  The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel.   To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant.  *See Bell v.  Cone*, 535 U.S. 685, 694-95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness.  *See Strickland v. Washington*, 466 U.S. 668, 686-87 (1984); *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir. 2000), *cert. denied*, 531 U.S. 1035 (2000).  In assessing performance, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*,

---

[2]Attorney Richard Lewis Tennett of Nashville, Tennessee, represented the petitioner at trial.  (Docket No.  1 at p. 5).

466 U.S. at 690-91. Reasonable attorneys may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams,* 367 F.3d 562, 570 (6th Cir. 2004).

The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

A court hearing an ineffective assistance of counsel claim must consider the totality of the evidence. *Strickland,* 466 U.S. at 695. "The determinative issue is not whether petitioner's counsel was ineffective but whether he was so thoroughly ineffective that defeat was 'snatched from the jaws of victory.'" *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996)(quoting *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992)(*en banc*)). "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689.

As discussed above, however, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holding of the United States Supreme Court, § 2254(d)(1); that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal

question is whether the state court's application of the *Strickland* standard was unreasonable."

*Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 178 L.Ed.2d 624 (2011). As the Supreme

Court clarified in *Harrington*,

> This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 131 S. Ct. at 786 (internal quotation marks and citation omitted).

In assessing the petitioner's ineffective assistance claim, the Tennessee Court of Criminal

Appeals applied the governing legal standard for claims of ineffective assistance of counsel:

> The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Id.*; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn.1996). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App.2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn.1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that the counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694)(internal quotation marks omitted).

*Black,* 2015 WL 9487735, at *6. Applying the law to the facts of Black's case, the Tennessee Court

of Criminal Appeals then agreed with the post-conviction court that trial counsel was not ineffective:

The Petitioner contends that he was denied the effective assistance of counsel based upon trial counsel's failure to seek indigent funds for a DNA expert for the defense and, as such, he is entitled to post-conviction relief. In denying relief, the post-conviction court found that the Petitioner had failed to present a DNA expert at the post-conviction hearing and had failed to show how the outcome of his trial would have been different had a DNA expert been presented by the defense. The record supports the post-conviction court's findings.

As we have repeatedly cautioned, a post-conviction petitioner cannot succeed on a claim that "counsel was deficient [for failing to call] a known witness" unless the petitioner "produce[s] a material witness who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called." *Black v. State*, 794 S.W.2d 752, 757–58 (Tenn. Crim. App.1990). "'As a general rule, this is the only way the petitioner can establish that ... the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which enured

to the prejudice of the petitioner.'" *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008)(quoting *Black*, 794 S.W.2d at 757). Neither the post-conviction court nor this Court "can speculate or guess on ... what a witness's testimony might have been if introduced." *Black*, 794 S.W.2d at 757. Absent the presentation of an expert at the post-conviction hearing who would have provided relevant evidence, the Petitioner cannot show deficiency or prejudice.

Because the Petitioner has failed to demonstrate what expert testimony could have been presented at trial or how he has prejudiced by the absence of that testimony, we conclude that the post-conviction court properly denied relief.

*Id.* at *6.

The state court's finding that the petitioner had not established prejudice resulting from trial counsel's failure to request funds for a DNA expert was not unreasonable. *See Martin v. State of Tennessee*, No. M2013-02480-CCA-R3PC, 2014 WL 6092850, at *7 (Tenn. Crim. App. Nov. 27, 2014)(quoting *Clark v. State*, No. M2006–01176–CCA–R3–PC, 2007 WL 2295583, at *9 (Tenn. Crim. App. Aug. 6, 2007))("[I]f a petitioner seeks to establish deficient performance based upon trial counsel's failure to employ an expert witness, then it is incumbent upon the petitioner to call a witness at the post-conviction hearing to establish that the witness's testimony would have benefitted the petitioner and that prejudice has resulted."). *See also Porter v. Johnson*, No. 3:14-cv-01798, 2015 WL 1549274, at *21 (M.D. Tenn. Apr. 8, 2015)("This Court has made clear that a claim of ineffective assistance of counsel arising from the failure to call a witness must be supported by testimony from the witness at the post-conviction hearing. Without the alleged witnesses' testimony, there is no way for the post-conviction court (or this Court) to evaluate whether the absence of the testimony from trial had a prejudicial effect on the outcome.") Even now, the petitioner does not indicate what information he believes a DNA expert would have yielded or how it would have helped him for purposes of establishing prejudice.

The court likewise finds that the petitioner has failed to show that the state courts' decision involved an unreasonable application of the *Strickland* standard. *Cf. Stewart v. Wolfenbarger*, 468 F.3d 338, 353 (6th Cir. 2006) ("The conclusion of both the state trial court and the state court of appeals, that there was no proper evidence to support Petitioner's claim [regarding what the witness's testimony would have been if he had testified], was not contrary to or an unreasonable application of clearly established law." (citing 28 U.S.C. § 2254(d)(1)).

Moreover, although post-conviction counsel failed to call the proposed expert to testify, the issue was fully litigated at the hearing, and the petitioner failed to establish that his trial attorney was ineffective. During the post-conviction hearing, the petitioner testified that he believed trial counsel had been prepared for trial. *Black*, 2015 WL 9487735, at *9. The petitioner acknowledged that trial counsel attacked the DNA evidence during each of his three trials by attacking the chain of evidence. *Id.* The petitioner also acknowledged that trial counsel also attacked the eyewitness testimony concerning the identification of the petitioner and vigorously cross-examined the officers in charge of the investigation. *Id.* The petitioner further acknowledged that several of the issues raised by trial counsel on direct appeal related to the DNA evidence. *Id.* Under these circumstances, the petitioner has not established that his trial attorney's decision not to retain an DNA expert fell below the standard of reasonableness.

Even assuming, *arguendo*, that trial counsel was ineffective for failing to retain a DNA expert, his ineffectiveness did not negate the fact that the two witnesses and the male victim identified the petitioner as the perpetrator of the crimes and that the DNA analysis in this case established the probability that the perpetrator was someone other than Black exceeded the world's population by "at least a million times over[.]" *Id.* at *10. Thus, even if Black could establish

ineffective assistance, he cannot establish prejudice.

The petitioner is not entitled to relief on the basis of this claim.

## VI. Conclusion

For the reasons set forth herein, Christopher M. Black's petition under § 2254 will be denied, and this action will be dismissed with prejudice.

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a *habeas* petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 154 L.Ed.2d 931 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Because jurists of reason would not disagree with the resolution of Black's claim, the court will deny a COA.

An appropriate order will be entered.

_____
Aleta A. Trauger
United States District Judge